Next, we have two consolidated cases, Hoffman v. INOVA Health Care Services. The panelists are represented by Mr. Bossom. Good to have you with us, Mr. Bossom. Good to be here. May it please the Court. My name is Tim Bossom. I represent the appellants, Kelly Hoffman and Lorraine Biondi Austin. We appeal two errors of the lower court. First, that Apolline Inova was not found to be a joint employer of the appellants, and second, that Mrs. Hoffman's attempted amendment of her EOC charge to add Apolline Napa as a party was found deficient. A joint employment determination is controlled by the nine-factor test established by this Court in the Butler v. Drive Auto case, where the Court made clear the test is to be fact-intensive and one for which a district court is generally not, quote, equipped to rule even on the basis of a summary judgment record alone, making remarkable that the trial judge here decided these cases on a motion to dismiss. As established in Butler, the first three factors are the most important, and I'd like to start with the first one, the authority to hire and fire the individual. On this point, the lower court found that, quote, appellants have not alleged that Inova had the authority to hire and fire. That was surprising because our amended complaint, and I will cite to Mrs. Hoffman's amended complaint because the facts are the same in both. This is that joint appendix 205 of Mrs. Hoffman. But Hoffman, her amended complaint at paragraph 24 states, Inova retained the right to terminate appellant's employment at Inova, directly contradicting what the Court found, but more importantly, Inova did, in fact, terminate the appellant's employment with Inova. Is that the authority to hire and fire? I mean, saying Inova had the right to prevent her from working at Inova isn't necessarily saying they had the authority to fire her from her job, right? Because you also alleged that she's hired by what is now NAPA, and that's her, you know, who her contract is with. Yeah. I don't think our briefs are as clear as they should have been on this point, Your Honor. But our position really is that they terminated her job at Inova. Counsel, or my esteemed opposing counsel, has argued in their brief I think 11 times that this was about suspending privileges at the hospital or just removing her from the hospital in that way. That is not what we are arguing. How do you explain the two-month delay between the suspension of privileges at the hospital and the actual termination?  Again, I think we confuse this issue by crediting the argument. The real issue here, and this is the third element in any Title VII discrimination claim, is was there an adverse employment action? And so what we are arguing is the adverse employment action is when my client was terminated from her job at Inova by Inova. No, but my question is, you would agree that there was a two-month delay between the suspension of privileges at Inova and the actual date that I guess you would use for termination? Well, yeah, again, I'm trying to step back. That is how the pleadings have made it sound, but that is not our argument. But is that what happened? No. So there was not a two-month delay between the suspension of privileges and the actual termination. As to Austin. Yeah. As to both people, there was a time when Inova removed them as an employee. And let me back up. This was not highlighted in our brief, and I apologize. I think we've confused the fact, and it's our fault. But if you look, this is Austin Joint Appendix 216. The e-mails that Inova sent to my clients, the appellants, when they denied their COVID vaccine exemption request said, and I'm quoting, the failure to comply with the vaccine requirements will result in an unpaid administrative leave, and further failure to obtain the COVID-19 vaccinations would mean your employment with Inova will end. Team members terminated for failing to adhere to company policies, and it continues. Inova, and we noted this, this is footnote two in the Hoffman amended complaint, they used the identical paperwork, I'm quoting now our footnote, the identical paperwork that Inova provided to all other employees. Okay. So back to my question. The ban was August 1st, right? Termination. I mean. So when they were, the privileges were, okay, so you're saying. That's not in the record. So you're saying August 1st was when they were terminated. Exactly. But they continued to work for NAPA until September 29th. There was no work. The reality was. They would continue to be on NAPA's, I guess, payroll or whatever until September 29th. That's correct. Okay. That's the only thing I'm asking. But your position is, and I understand that, but I just want to get those dates right, but your position is that they were terminated from Inova on August 1st. Yes. And I think this is where we made a mistake in our briefing, not to clarify this point. It's an adverse employment action. And so meaning, and I want to explain this. Inova removing my clients from their employment, Inova's words, at Inova on August 1st, was an adverse employment action. Whether you call that a suspension, whether you call it whatever. Well, I mean, that's a nice way to try to dance around the pivotal issue, which is, is it an employer, right? That's what the district court talked about, and that's what I thought we were talking about here, is that you can have an adverse action, but it has to be by an employer. That's right. What does the complaint allege about who was the day-to-day supervisor of these employees? Yeah. Who supervised their day-to-day work? What does the complaint allege? I didn't see anything. Okay. Well, on that point, this is factor two. I'm looking at Hoffman Joint Appendix 203, paragraph 18. We said, Inova set and monitored Mrs. Hoffman's work schedule and could approve or disapprove her time off. Right. So the complaint alleges that Inova controlled, could deny medicines for patients, and that Inova, there was one instance that applied to both women where something happened during the day and Inova's staff member said, you can go home. It turns out that that was wrong. They weren't allowed to go home, and Inova disciplined that. But that doesn't say anything about day-to-day in their job as anesthesiology nurses, right? Right. Who's supervising that day-to-day? What does the complaint say? Yeah. But I do want to emphasize, the Psilocybe case. Sorry. What does the complaint say? Does it allege who's supervising that day-to-day in their work? Other than the medication, I don't think. I think that's the only allegation, but I wanted to point out. And these were amended complaints, right? The district court had already pointed out the deficiencies and said, you know, give it your very best shot to allege everything you can to show me why they were Inova employees under Inova's control. Right. They were amended complaints. And, yes, we did give it our best shot, Your Honor. But I would point out, we didn't have discovery. The contracts that were attached to the motions to dismiss were not in our possession. And then, as we noted, they were heavily redacted. So we don't even know what other, you know, provisions were in there. I would note, though, in the employment contract with Ms. Hoffman, which was the only contract that was attached, Ms. Austin's was not attached to the motions to dismiss. But in Ms. Hoffman's, it notes that she was supposed to be under the supervision of physicians. And I would point out, she was under the supervision of all physicians, not just anesthesiologists. I know that this was on a motion to dismiss, and so there might be some debate about whether the contracts are integral to the complaint. But is there any, I know dispute is not the word because we're not assuming judgment, but is there any disagreement that the entire anesthesiology department were NAPA employees, that no anesthesiologist could work at Inova except for NAPA employees? That, we are, well, we objected to the authenticity of that document that did say that American Anesthesiology was the exclusive provider of those services. We don't know, and I think my clients would say that they did bring in traveling nurses to assist. So, no, I don't think they were, in fact, but we never got to that issue. Again, we didn't have those contracts. I mean, we never, my client had never seen the contract between American Anesthesiology and Inova until they were attached to the motion to dismiss. We were very handicapped, obviously, to argue against those. But I do think that's what that purported to say, is that they were the exclusive provider of the anesthesiology services at the hospital. But, again, I want to point out, too, right, my clients are nurses. They take instructions from doctors. That's all doctors. That's the doctors at Inova. So it's more than just the anesthesiology doctors. And, obviously, as this would come up, one of my clients, Ms. Austin, worked in the surgery center. So she would have worked with surgeons. Didn't she list on her vaccine exemption form that her supervisor was an anesthesiologist? That is a fact question that should be looked into in discovery, Your Honor. But she did do that. But I would say, I mean, I think that's the intermediary, not the day-to-day supervisor, but the person who ultimately had the back and forth, the liaison, if you will, between American Anesthesiology and Inova. Again, that counters our pleadings. We said that it was Inova who had the right to monitor and ultimately decide how to treat our clients at Inova. Well, you allege that Inova set and monitored the schedule. We can't read more into your allegations than is there. Right. We went past that. I mean, we talked about it was Inova who would address any problems directly with our clients. I think this is paragraph 18 of our mandate complaint. There were other allegations in there as to this issue. But I'm trying to point out the Silichek case made clear that it's not so important who controls professional, the professional work, if you will, in the medical context. It is more important who schedules the employee. It literally says there about a doctor who decided which hours the doctor would work. Silichek might be a little different because that was the doctor, right, who's not really a supervisor for the lead doctor. But I think that makes our case simpler or, you know, it's easier for a nurse to be found to be under an employer whereas a doctor. And Silichek was dealing with an independent contractor context as well. Are you aware of any other court that has found that a joint, that has found a joint employment relationship between a hospital and a staffing agency? The Sidley Memorial Hospital case out of D.C., the D.C. Circuit Court, which was cited by Butler, was one such case. There was also the Crump, the T.C. Coombs case that we cited to the lower court, which was another Eastern District of Virginia case. That was a physician assistant. Look, I've looked throughout the nation, and there aren't cases on either side of this issue. So I think, to the Court's point, I jokingly wondered if nurses just aren't litigious. Because there's a lot of doctor cases, but there aren't many nurse cases. To the extent that there are, the Crump case in the Eastern District was found in our favor. And so I would point the Court to that case. And it would make sense, actually, that nurses would be treated differently because there's more control that's going to be placed on a nurse by a hospital than there would be by a doctor who's going to work without supervision generally. I think we've covered the first three factors. The other factor that was considered by Butler, and I think the Butler Court found important, was the seventh factor, which is whether the individual's duties are akin to a regular employee's duties. The Butler Court there clarified that what they were concerned about is whether the work was, quote, tangential or peripheral, or if it's the same task, producing the goods, the same goods that are core to the business. Here, my clients, I know they were doing anesthesiology, but they were nurses. They were producing the same product for Inova. They weren't janitors or outside contractors, maintenance people. They were health care providers, just like everybody else at Inova. So that factor weighs in favor of our clients as well. We, I would just note quickly that factors. Could Inova substitute? I mean, you're saying, so are the nurses fungible? Could a nurse without these special qualifications substitute for your clients? I don't think they're fungible. Just like I don't think the employer in the Butler case working in a manufacturing plant, I mean, employees might be doing different parts of the process. But ultimately, the core good, if you will, to quote Butler, is health care services. So this is exactly what Inova does as its core mission was exactly what my clients were doing. I guess I read the seventh factor when they're akin to a regular employee's duties to be asking maybe a more specific question than that. And whether, you know, whether they can be interchanged with regular employees and hear that when the entire specialty is not interchangeable, that seems like a hurdle for you. Well, on the surface it would, but again, quoting the Butler language, what the court said is we're really focused on are you working in their core processes, what this company exists to do. And in that case, I don't think it's a hurdle. I think we're very much doing what Inova exists to do, which is provide those services. And I would note also, I mean, our nurses, this is paragraph 23 of our MEDIC complaint, also did things like placing IV lines into patients, repositioning patients, things that any other nurse would do as well. So, you know, they weren't exclusively doing anesthesiology services. And to the court's question, I would also note paragraph 19, we also noted they wear the same uniform down to the shoes, same badges, and they're indistinguishable from other nurses in the hospital. I would just say really quickly, Butler was concerned about effective control, not formal control. And we think Inova exercised that effective control in this case. And I'll reserve the rest of my time. Thank you, sir. Ms. DeLogue? I feel I need to be taller. Good morning. My name is Nancy DeLogue. I'm here for Inova Health Services. I want to emphasize a couple of things right off the bat. These two cases do not present any novel issues of law. The issues presented are simply whether either of the two appellants included in their amended complaints facts sufficient to state a plausible claim that Inova was their joint employer, and they did not. And I want to clear up something that came up in, you know, Mr. Boston's argument just now. These individuals are not just nurses. These nurses are anesthesiology nurses. The first paragraph as to part use, as to each individual, Joint Appendix 201 for Ms. Hoffman. Ms. Hoffman is a certified registered nurse anesthetist. This is important because Inova-employed staff nurses are outside their record, but they are not medical staff members. These two individuals were medical staff members by virtue of their specialty practices, and I just want to clear that up. Mr. Boston may have confused the issue, but they are here to provide anesthesia, and, you know, I don't know what to say about it beyond that because that really is outside the record to suggest that they are nurses alongside with everyone else at Inova. Whether someone is a joint employer, of course, is an issue of law for the court to decide, and that legal decision can appropriately be made at the motion to dismiss case that this court has held in 2021. It's Smith v. CSRA. It was the case that said that it's an issue of law, and it's the Lemon v. Myers Beagle case from also earlier in 2021, and also the Bender v. Suburban Hospital case, a little bit older, 1998, disposed of the joint employment issues on a motion to dismiss. Clearly, plaintiffs were aware of the joint employer standard. They actually pled it in their initial complaints, and despite being full notice and an opportunity to be heard regarding why the complaints fell short, each then filed an amended complaint that, again, failed to include more than conclusory allegations about their relationship to Inova. Now, significantly, this court has held that the Rule 8 pleading standard does not require a court to accept as true unwarranted inferences, unreasonable conclusions, or arguments, and that is significant because each appellant acknowledged in her pleading that she was assigned to perform services for Inova pursuant to a contract between Inova and what is now NAPA, the anesthesiology practice. That's at Joint Appendix 9 for Ms. Hoffman, Paragraph 12, and Joint Appendix 7, Paragraphs 10 and 11, for Ms. Austin. And when Inova provided the relevant portions of that agreement as integral to the allegations made in those amended complaints, the court correctly recognized that these documents could be considered on a motion to dismiss. And as we know, where the allegations of a complaint contradict any attached exhibit, the exhibit prevails. We did see some contradictions there. Ms. Hoffman's employment contract with NAPA contradicted her allegation that she would be terminated for cause if Inova demanded that she be removed from providing services. In fact, when the court looked at it, it says that court, that agreement says, if Inova removes your, suspends your medical, I didn't say Inova, but if the client suspends your medical privileges, then NAPA may, after due consideration, decide to remove you from its employment as well. That was strictly between them. Whether they exercised that right and whether they did so later is entirely separate from whether Inova retained that right, which is the standard we're looking at here. So we've gone over the nine Butler factors. And I will come back to the first element, the right to hire and fire the plaintiff. Just to be clear, because I don't think it's really addressed in the record, there are no allegations that Inova made any, played any role in hiring either of these individuals. They weren't interviewed. They didn't fill out employment applications. There's no allegation that, you know, they, you know, asked them to not work anywhere else. And I think that distinguishes this case from the Chavez-Derrimer decision that this court issued just this July. That was an FLSA case, but it also involved nurses. So I wanted to bring it up. No allegation that Inova played or had any right to engage in any hiring decisions. With respect to terminations, I do think my opposing colleague here has confused what would be an adverse employment action under the Muldrow standard with the right to hire and fire, which is a different factor used in Butler to sort of, to focus on the common law element of control, who controlled. And so I want to be clear that I understand they are alleging that had Inova been their employer, being suspended for medical staff privileges could have been an adverse action. But since Inova was, did not have that control to be their employer, that falls short here of saying, of saying something else. Ms. Hoffman also alleged in her complaint that, you know, following her suspension from employment with NAPA was a dead letter. I think the court has raised some good questions about that. There's been no repudiation of the, you know, the fact that she was not, in fact, actually separated for another few months. And, in fact, at Hoffman's record, Joint Appendix 111, NAPA actually controverted that argument by saying that it had offered her alternative assignments both before and after Inova had suspended her medical privileges. I consider that that's not in the complaint, and it's not in, even in any of these contracts that were, you know, maybe integral to the complaint. I think it's interesting, right? It's in the Joint Appendix, and it is because of the separate arguments which haven't been raised, that NAPA should be in the complaint and that they actually took adverse employment action. I don't know whether it's here for Inova. Well, I get the 12B6 stage. You know, we're, you know, we're looking to Inova at the same standard the district court had to apply. And, I mean, that has pretty strict blinders to just look at the complaint and its attachments, right? I think that's correct, however. Maybe we need some discovery here. I don't think discovery would be helpful in this matter. In this, so just to answer Judge Rushing's question, NAPA attached those as integral to and responsive to their allegations, the allegations against NAPA, and I don't believe they were controverted. But that's, like, not the standard, right? It's not what the defendant thinks is integral to how they might defend against the complaint.  That was a motion to dismiss on their part, however, and it's integral to the report. Maybe more importantly, that has not been refuted. And I don't know why they wouldn't. I don't want to get you hung up on this, but, like, they don't have to refute your allegations at the 12B6 stage, right? They certainly do not. The plaintiffs get to make the allegations, and we are supposed to credit them. Understood. If it were my complaint, I might have addressed it, but that was not here. I don't think that Ms. Hoffman, so with respect to the hiring and firing, though, I think the allegations were contradicted by the complaint, excuse me, by Ms. Hoffman's employment contract with NAPA and, to a lesser extent, the contract that ANOVA supplied that it had with the anesthesia practice that would have applied to, that did apply to Ms. Austin. Now, Mr. Bossen has alleged that they objected to that, the production of that document as well, in response to their motion, and I think that's a little inaccurate. They objected to the fact that portions of it were redacted. They did not question its authenticity, and I think that that, again, a district court is allowed to consider that in those circumstances. And, again, they had an opportunity to address that and to be heard not once but twice by the district court. The day-to-day supervision of activities, the second factor, I think, was also covered pretty well. I don't believe that there are substantial allegations that anyone at ANOVA supervised their work. I will say that she wasn't, you know, the allegations that ANOVA checked her licensure, imposed badging requirements, even decided which medications to make available all go to the sorts of standards that a hospital has to meet for professionalism standards. They don't go to controlling her work. There's no allegation, for example, that if Ms. Hoffman determined that an individual needed a particular medication, that ANOVA would say, no, they don't get any medication. The allegation was simply that certain medications might not be available, and I think that's significant. She is still left with the, you know, authority to make decisions about what her practice believed was appropriate for the patient. With respect to the disciplinary situation, it is quite vague. I think it's too vague, frankly, to put ANOVA on notice of the allegations against it in that regard. However, the last paragraph, and my colleague discussed this in the amended complaint that suggests that something uncomfortable happened at work and that one or both of them were sent home, after which a suspension followed. The only suspension that has actually been alleged to have occurred in this circumstance is the suspension of the medical privileges, and I don't know whether that was something upsetting that happened or not. But it's too vague to actually be meaningful and to put us on notice of what ANOVA is alleged to have done there. I don't know how it can be meaningful to this court in helping decide whether ANOVA had day-to-day supervision of her activities. The place of work I want to touch on briefly. I think it's interesting, right, you know, of course they were working at the hospital. Hospitals are where anesthesia patients are. But the third factor about whether ANOVA supplied the place of work is not as strong as it would be in this circumstance, and the two cases that sort of support that from this court are, of course, the Tsilochek case and the suburban hospital case, which kind of collected all of these examples that explain why medical professionals may be treated differently and why the provision of a hospital staff and making sure that the hospital is run in a way that meets federal regulatory requirements does not weigh, right, in terms of hospital controlling the actual practice. I think the last point that, to just address my colleague's arguments, Tsilochek is helpful for discussing indicia of control. I think that there is a very clear claim that had ANOVA controlled these individuals as it did their nurses, we might be in a different circumstance. And so I do want to come back to the fact that that's not accurate. But the appellants here didn't challenge the authenticity of the contract between ANOVA and the other one. There is a different standard that applies here, and I think it's the Lemon case that states to find employment here would be really stretching the bounds of what constitutes employment too far. And if so, it will be past the breaking point. And understandings that have been central to the organization, not at that law firm in this case, but of hospitals' care for decades. And again, the Tsilochek case has stood with this Court since 1997 and the Bender case since 1998. If the Court were to rule otherwise, it would be making a big change in how hospitals organize their practices. Thank you. Thank you very much. And Mr. Singer? Good morning, Your Honor. Good to have you with us, sir. Great to be here. May it please the Court. Scott Singer on behalf of North American Partners in Anesthesia. In this case, the issue for my client is fairly clear cut, and I'll try not to complicate it too much. And I believe my opposing counsel actually summed up what the critical issue is, and he framed it as an attempted amendment of a charge of discrimination. And that's really the issue. This was an attempted amendment. It wasn't an effective amendment. So what did – I couldn't understand from your brief. What did Ms. Hoffman not do that she was supposed to do? What was she supposed to do to exhaust that she failed to do? Your Honor, I think there is a kind of compounding nature of what was not done. In this particular case, and I'd go back very quickly to this Court's precedent on the issue. I'm sorry. This is like a straightforward factual question. I just want to try to understand in the EEOC's process, there is something that has to be done to amend, and you're saying she didn't do it, and therefore she didn't exhaust. So, like, what is it that she's supposed to do that she didn't do? Yes, Your Honor. It would be to ensure that a formal charge, or at least a notice of some sort, to provide a charge to the EEOC that ensures that notice was provided to the respondent. I didn't think that complainants provide charges to the EEOC. I thought the EEOC gives the charge to the complainant. Yes, Your Honor. Okay, so walk me through what didn't happen, like step by step, because this is confusing. Of course, Your Honor. In this particular case, there was an initial charge filed. There's no dispute that that initial charge identified only INOVA. The allegations only spoke to INOVA. There was a subsequent personal letter that was unsigned that was submitted by Ms. Hoffman with her attorney copied. So she had counsel throughout this. That letter requested or advised the EEOC of intention to amend. And thereafter, and that was submitted, I believe, approximately nine months after the initial charge of discrimination. Now, that letter was not followed up with by counsel. They received a notice of right to sue that identified INOVA. In fact, in the joint appendix at page 7. So that's what happened. So what is supposed to happen? If someone wants to amend their EEOC charge, what does the EEOC tell them to do? What are they supposed to do that she didn't? In this case, Your Honor, given that Ms. Hoffman was represented by counsel, I would take the position, and I believe the case law addressing this is distinguishable because most of it involves pro se plaintiffs or individuals at least acting pro se. But I think at the least, there's an obligation to exercise some due diligence in the sense that they would need to follow up. In particular, given that she received a notice of right to sue, that identified only one respondent versus two respondents as she wanted or attempted to amend. So I had to go try to find what the EEOC requirements are on my own because it didn't tell me. But it looks to me like, according to the EEOC, you're supposed to send them something saying, I want to amend, right, so that they've already given you their summary of your charge. And then the complainant says, I want to amend. So here she has her letter. She puts her claim number on it. She tries to tie it to her existing complaint and says, I want to amend. It's titled something like amendment. But the EEOC then has to respond by actually evaluating it and amending your charge. And then they send the complainant an amended charge that the complainant can then choose to accept or reject. And then it is amended. And it looks like we have no information about, I mean, she says she tried to amend and that didn't happen. So why is that not, why is that her fault? What was she supposed to do that she didn't do? Your Honor, again, I think the distinction here is that the cases that speak to this issue, and I understand they're factually distinguishable based on the fact that I believe all or most of them included communications by individuals who are unrepresented. The distinction is the notice issue. There must be some due diligence exercised on behalf of Ms. Hoffman here and her counsel, given that she's represented, to ensure, I mean, given the passage of time. And I believe this is a fact-specific inquiry. Well, like, you know, she tries to amend. She waits and waits. The EEOC doesn't respond with maybe what she expects, or maybe they do. I have no idea. It's not been alleged whether they sent her an amended charge or not. But they send her a right to sue letter, and you're right, it only mentions ANOVA. But at that point, is it, I mean, it's probably, is it too late for her to try to go back and amend at that point? She has a right to sue letter. I'm still trying to understand what you say she was supposed to do that she didn't do. Your Honor, again, I'm, my. Is it, like, follow up? Exactly. She didn't, like, call a few weeks later. And so that's unexhausted for all time. Yes, Your Honor. I would say it's a fact. Why is that not the EEOC's problem? I mean, they didn't do what they were supposed to do, maybe. We just don't know yet. Your Honor, I think there's a decision to be made on allocation of fault. In particular here, I think that the analysis is a little different given that she's represented. She's not pro se. I mean, I think the facts in the Calgill case, which is I think the most recent case from the Fourth Circuit that speaks to this particular issue, and I think it's very helpful in the expression of policy that it mandates. And in that case, the plaintiff initially submitted a letter, personal letter, and then his attorney, who he had, you know, you assume had retained at some point, followed up. And it was through that follow-up that actually led to a formal charge of discrimination being filed. And that was the court's analysis. Those were the facts that it was evaluating in Calgill. And I think that opinion and the ruling there and the holding there, it mandates that we take a closer look at the facts. And in this particular case, those facts speak strongly to recognizing this as an attempted but not an effective amendment. We have a charge, an initial charge of discrimination that's filed. There's no dispute that it identifies INOVA only. There's a very belated, in my opinion, letter, personal letter. Can you amend a charge to add a new target of the charge, like a new employer you're complaining about? I didn't see you all disputing that, but it struck me as maybe you have to just file a whole new charge. Your Honor, I think it's a question I've asked myself. I have not found clarity through the EEOC's website, and maybe that's an issue there as well. But I would think at the least, given, and I think that's another distinction, Your Honor, that is not captured in the argument of opposing counsel, in that a lot of those situations dealt with either substantive allegations or they dealt with new facts. This is a case we're talking about an entirely new respondent. And I believe the responsibility of the charging party, particularly when they're represented by counsel, was heightened. And in this case, she did not meet that requirement. And for that reason, I ask that you affirm the district court's ruling and find that she did not exhaust her administrative remedies. Thank you. Thank you. Mr. Botkin. Thank you, Your Honor. Addressing first the issues with NAPA, just as a factual matter, Ms. Hoffman was not represented by us in the EEOC process. She noted that she had consulted with counsel and we were helping her with her ‑‑ we wrote a letter to ANOVA for her, but we did not assist her. You can see this at JA 15455. That updated amendment letter she sent was clearly from her, was not from us. We would not have done the process this way. But to the Court's questions, the Edelman case, this is Edelman 2 in 2002, made clear that, quote, the failure by the EEOC to fulfill its statutory duties regarding the charge does not preclude a plaintiff's Title VII claim. And that's what happened here. She did what she was supposed to do. She uploaded an amendment to the EEOC portal, and they apparently took no action. Again, that would be a fact question that would have to go into discovery if we wanted to look into those details. But as it stands now, I believe she did everything that she needed to do. And it's unfortunate that NAPA didn't get noticed, but that's on the EEOC. That should not be taken against the appellant here. If I may, I wanted to turn back. I think I neglected a few paragraphs of our complaint when asked questions earlier about what we pled regarding ANOVA's supervision or actions. And so I just want to point it to amendment complaint paragraph 15, where we said, ANOVA exercised oversight over Ms. Hoffman's work. And we went on to say making sure to monitor her work. ANOVA staff addressed her directly regarding any problems. And then in paragraph 24, we said ANOVA exercised authority over assigning and supervising the work Ms. Hoffman performed. So I just wanted to clear the record there that there were other allegations in our complaint as to the actual work that Ms. Hoffman was doing, or both appellants. I did, I neglected to speak to the third factor earlier, and opposing counsel for ANOVA brought that up. And I wanted to point out, I thought the corrupt court, the trial court in the EDVA that addressed a similar issue, it was a physician assistant there, made a very interesting point in saying that it's actually very important who decides the equipment and the location when you're talking about joint employment, as opposed to an independent contractor situation like Silichek. The court noted there in Crump, in a joint employer case, it's very relevant which of the two possible employers provides the location and the equipment, because that speaks to the control inherent in such provision. So the third factor, I should have said this, but the third factor is probably our strongest factor. ANOVA, and there's no dispute, they provided the location of the work, and they provided all equipment down to even, this is from the contract that we objected to, but if we're going to use it, down to even the fully stocked anesthesia cart with medicine and supplies. And they continued there to say. Silichek kind of, I mean, I know that was an independent contractor, but I thought the opinion there kind of cast this third factor as less relevant in the healthcare industry because of where a patient has to be treated and the responsibility that the hospital has for making sure that the proper equipment and all that is used. I don't think Silichek actually said that. I think Judge Nachmanoff said that in his opinion about Silichek. What Silichek said is the professional standards and the degree of care is less important. And I think Judge Nachmanoff picked up on the concept that, as the Court's saying, you know, you have to go to a hospital for some things. But as the Crump Court pointed out in another hospital case, you could have outpatient clinics. ANOVA could send people for certain things for anesthesiology to an outpatient clinic run by NAPA or run by whoever else, other employers. So as the Crump Court pointed out, and I think it's important, who provided those elements? And to the Court's point, even if you take the location, what about the equipment? NAPA could have provided the equipment. So whoever, it is important to see who exercised the control in deciding what equipment to provide to the employee. So in a joint employment case, as opposed to an independent contractor, I think it is very important who provided the equipment. So it should not have been dismissed as light. I think it's a very important factor in our favor. I believe, oh, I did want to say just finally, counsel said the Bender and the Silichek cases are basically the Fourth Circuit precedent. But those cases both dealt with doctors. They both dealt with independent contractors. There is no Fourth Circuit precedent on an employee situation like Butler in the medical context. And so we're not asking for any earth-shattering overturning of decisions here. All we're saying is apply Butler to the medical context, particularly to nurses. We understand that we're narrowing our case to nurses. And I think the Court should find that hospitals are the effective employers in cases like this. Thank you. Thank you very much, sir. We'll take this case under advisement. And for right now, we'll come down and greet counsel and then take a short break. The Honorable Court will take a brief recess.
judges: Robert B. King, Allison J. Rushing, DeAndrea Gist Benjamin